[Civil No. 1513.   Filed June 26, 1916.]

[158 Pac. 451.]

CONSOLIDATED NATIONAL BANK OF TUCSON and J. C. KINNEY, Appellants, v. LOUIS J. GIROUX, AUGUSTIN BERAND & EMILIE BERAND, Copartners, etc., Under Firm Name of GIROUX & CO., Appellees.

1. EVIDENCE—EVIDENCE OF OTHER TRANSACTIONS—BREACH OF CONTRACT. In an action for breach of contract of sale in refusing to accept delivery of cattle, evidence that defendant with consent of plaintiff deducted $3,000 from purchase price of previous shipment under same contract is inadmissible and prejudicial, as creating an improper inference that defendant wrongfully took advantage of plaintiff in another transaction not involved in the action.

   [As to effect on sale of fraudulent concealment by vendor, see note in 15 Am. Dec. 106.]

2. SALES—CONTRACT OF SALE—MODIFICATION—EFFECT.—Upon delivery of cattle under contract of sale, the agreement by seller to allow a deduction to defendant from purchase price, for deterioration of cattle, is a modification of the original contract and binding on the seller.

3. SALES — ACTION FOR BREACH — INSTRUCTIONS. — In an action for breach of contract in refusing to accept delivery of cattle, where court improperly admitted evidence that defendant deducted $3,000

from purchase price of previous shipment under the same contract, a refusal to correct the error in admitting such evidence, by instructing the jury that plaintiff was bound by his acceptance of the deduction with full knowledge of the facts, *held* prejudicial error.

4. SALES—CONTRACT—PERFORMANCE—WAIVER—MODIFICATION. — Where plaintiff, after contracting to sell and deliver certain cattle from a certain herd, subsequently sold merchantable cattle from such herd to other buyers, while the acceptance by the buyer of two shipments of inferior cattle was a waiver of the terms of the contract as to such shipments, his refusal to accept further shipments of such inferior cattle was not a breach for which he was liable.

5. SALES—CONTRACT—BREACH.—Where defendant bought cattle to be selected by him from all the cattle of a specific herd, the sale by the owner to other buyers of cattle from such herd was a breach of the contract, and defendant was not obligated to accept the culls and remnants of such herd.

6. SALES—CONTRACT—BREACH—TITLE OF SELLER AT TIME OF SALE.— No breach of contract of sale can be based on the fact that, at the time of sale, the seller was not the owner, and had no authority to sell, unless at the time of delivery the seller refuses or is unable to make delivery.

7. SALES—BREACH OF CONTRACT—INABILITY TO DELIVER—DAMAGES.— Where plaintiff, after selling cattle to be selected by defendant from all cattle of certain herd, sold a large quantity of the best cattle from such herd to other buyers, his inability to deliver the kind and quality of cattle contracted for was a breach of the contract for which defendant was entitled to damages.

APPEAL from a judgment of the Superior Court of the County of Santa Cruz. W. A. O'Connor, Judge. Reversed.

Mr. S. L. Kingan, Mr. T. K. Richey and Mr. S. F. Noon, for Appellants.

Messrs. Duffy & Purdum and Mr. Eugene S. Ives, for Appellees.

ROSS, C. J.—This action was brought by the appellees against the appellants to recover liquidated damages for the breach of a contract. Those parts of the contract that are material to a consideration of the questions involved are as follows:

"This agreement, made and entered into this 10th day of March, 1914, by and between Giroux & Co., of Hermosillo,

Sonora, Mex., hereinafter known as the seller, and J. C. Kinney of Wibaux, Mont., hereinafter known as the buyer, witnesseth as follows:

"For and in consideration of the prices herein mentioned, which have been mutually agreed upon by both parties to this contract, the seller hereby agrees to sell and deliver F. O. B. cars in good shipping condition at Nogales, Ariz., eight thousand (8,000) to ten thousand (10,000) head of cattle, consisting of all the cattle owned by Giroux & Co., the seller, and the Alamo Cattle Company, that are now in the Moraga pasture and the Saracachi pasture, both pastures being in the Magdalena district, Sonora, Mex. (branded     ) at twenty-five ($25) dollars per head. . . .

"First delivery, to be made up of 3,000 to 4,000 head, on or before April 15th.

"Second delivery, to be made up of 3,000 head, on May 20th.

"Final delivery, to be made up of 2,000 head or more, on June 15th.

"All duties, sanitary inspection, dipping, brand inspection charges paid by seller and accompanied by corresponding veterinary's certificate. The seller agrees to allow the buyer the privilege of cutting out and rejecting 15 per cent. of said cattle after all cripples, lump jaws, swaybacks, dwarfs or runts, blind or unmerchantable cattle have been cut out by the seller. . . .

"Both parties to this contract hereby mutually agree to the following terms and conditions: The buyer this day deposits with the Consolidated National Bank of Tucson, Ariz., the sum of sixteen thousand ($16,000) dollars, being $2 per head on 8,000 head of cattle called for under this contract, which is the minimum number the seller agrees to deliver. The buyer agrees to pay the balance of the purchase money when said cattle are delivered in accordance with the provisions of this contract, and, failing to do so, the said Consolidated National Bank is authorized and empowered to pay over to the seller the amount of advance money then up on this contract as liquidated damages for failure on the part of the buyer to receive and pay for cattle when delivered on board cars, but the buyer shall not be liable for any further damage on account of failure to receive and pay for cattle when delivered as above stated. The buyer shall also forfeit the

amount so deposited if he refuses to make the cut at the time and place mentioned in this contract, unless detained or delayed by unavoidable conditions, not to exceed 7 days, the seller in such case to be allowed like additional time for the making of such deliveries. . . .

"The seller this day deposits with the Consolidated National Bank of Tucson, Ariz., the sum of eight thousand ($8,000) dollars, being $1 per head on 8,000 head of cattle called for under this contract, as a guarantee of the delivery of the cattle called for under this contract, and, failing to do so, the said Consolidated National Bank of Tucson, Ariz., is authorized and empowered to pay over to the buyer the amount of advance then up on this contract as liquidated damages for failure on the part of the seller to deliver the cattle in accordance with this contract, and the seller shall not be liable for any further damages on account of failure to deliver said cattle."

Under the terms and conditions of the contract, the appellees deposited $8,000 and the appellant Kinney deposited $16,000 with the appellant bank. The appellees, claiming that the appellant Kinney breached his contract, sue the bank and appellant Kinney to recover the full sum of $24,000. In a cross-complaint filed by appellant Kinney, he claims that appellees breached the contract, and he therefore asks judgment for the full sum of $24,000. The appellant bank appears to be interested in the litigation only as a stakeholder of the funds involved.

Appellees set forth in their complaint facts showing that the contract of March 10th was partly performed, in that on the fifth day of May, 1914, in pursuance of said contract, the appellant accepted 1,576 head of the cattle mentioned in said contract and paid for them at a price $3,000 less than the contract price of said cattle; the deduction being made in accordance with a contract entered into on that day between appellees and appellant, Kinney. The contract of May 5th is attached to the complaint and made a part of it, and in this contract the reason given for the deduction is that the "cattle are in a bad condition and very much deteriorated in value" by reason of delay and negligence of the railroad company in handling and unloading them. It is also shown in the complaint that on May 9, 1914, the appellees delivered, and the

appellant Kinney accepted and paid for, 1,614 head of the cattle described in the contract of March 10, 1914. On May 13, 1914, it is alleged in the complaint, the appellees had at Nogales, Arizona, 1,006 head of the cattle mentioned in the contract; that said cattle were in good shipping condition, and that delivery was made in compliance with the terms and provisions of said contract and upon a date agreed upon by the parties to the contract; "that the said Kinney, notwithstanding the said delivery was made pursuant to the said contract and upon a date agreeable to him, did thereupon refuse to receive or pay for said cattle or any of them."

The allegation of performance by appellees is as follows:

"That the plaintiffs have in all things performed the obligations and duties imposed upon them by the said contract and have stood ready, able and willing to make delivery of all said cattle contracted to be sold as prescribed in said contract in the manner and at the times and place therein specified, upon the said Kinney making a selection and cut therefrom as provided in said contract; that after the thirteenth day of May, 1914, the said Kinney made no further cut or selection of said cattle and has refused to recognize the said contract as being in full force and effect."

Appellant Kinney in his answer plead a modification of the contract of March 10th, which, briefly stated, is as follows: He states that, before any of the cattle were accepted and paid for by him, he complained to the appellees that the cattle tendered him were not of the grade or quality represented, and that the appellees then and there agreed, in consideration of the acceptance of said cattle by appellant and of other cattle, that appellees would include in said contract of March 10th, 2,000 head of certain cattle of high grade, to wit, the James cattle; and that said contract was accordingly modified to include the James cattle. He alleges that he accepted and paid for the second shipment of 1,614 head under and pursuant to the terms of the contract of March 10th as modified to include the James cattle, and in consideration thereof. He admits that he refused to accept 1,006 head because he says they were not of the grade or quality represented by appellees; that there were at least 50 in number of them, dwarfs, runts, old cows and unmerchantable cattle; that he did offer to accept and pay for 956 head on condition

that appellees would deliver to him 1,000 head of the James cattle, which were at that time in the stockyards in Nogales, but that appellees refused to deliver the James cattle or to cut said fifty head from the inferior cattle tendered, unless the appellant would pay back to appellees the $3,000 deducted for loss and depreciation, as evidenced by the contract of May 5th.

Appellant Kinney denies that the appellees had performed the obligations, duties and terms of the contract; denies that they have stood ready, able or willing to deliver said cattle contracted to be sold in said contract; and denies that the appellees were ready, able or willing at the times and places therein specified, or at all, to make selection and cut of said cattle, as in said contract provided. The appellant in his cross-complaint sets up the contract of March 10th as modified by the contract of May 3d to include 2,000 head of the James cattle; alleges nonperformance and a refusal to perform upon the part of the appellees, and also sets up the inability of the appellees to perform their contract in this language:

"That plaintiffs at no time delivered, or offered to deliver, to defendant the cattle of the Alamo Cattle Company as set forth in said contract, and defendant is advised and believes, and on such information and belief avers the fact to be, that plaintiff did not at any time, on or after the date of said contract of March 10, 1914, have the right or power to sell or deliver said cattle and could not deliver or dispose of the same."

The appellees' answer to the cross-complaint denies the James contract, or any modification of the contract of March 10th; they also set up in their answer that the deduction of $3,000 from the shipment of May 5th was arbitrarily and fraudulently claimed and made; that said cattle were not in bad condition or deteriorated in value; and that appellant refused to purchase the same unless the appellees should agree to remit $3,000 of the purchase price thereof.

The case was tried to a jury and the verdict was in favor of appellees, upon which judgment was duly entered. Motion for a new trial was overruled. The appeal is from the judgment and order overruling the motion for a new trial.

The errors assigned by the appellant as reasons that the judgment should be reversed are several in number. Our

statement of them, as we shall consider them, is as follows: (1) That the court erred in the admission of evidence offered by appellees to impeach and contradict the settlement made between appellees and appellants as evidenced by the contract of May 5th; the said contract being pleaded by appellants in their complaint as a modification of the contract of March 10th. (2) That the court erred in refusing the instruction, asked by appellants, to the effect that the contract of May 5, 1914, was binding upon the parties, and the recitals of fact therein could not be disputed or contradicted. (3) That the court erred in denying appellants' motion for a new trial and in entering judgment for appellees, in that the verdict and judgment are not sustained or justified by the evidence, and are contrary to the law and the evidence, because the evidence establishes without contradiction or denial that long prior to the 1st of May, 1914, the appellees were unable to sell or deliver said Alamo cattle, and were then in default and did then breach the contract; said breach being a continuing one and prior to the alleged breach of appellants.

The parties to this litigation have treated their contract as entire and indivisible, and we think properly so. Under it, the obligation to deliver the cattle described in the contract and the obligation to receive and pay for them are dependent upon each other. A failure or refusal to accept and pay for the cattle described in the contract, when tendered at the times and places mentioned, would amount to a breach thereof; likewise a failure or refusal to deliver the cattle contracted for at the times and places mentioned, the buyer being ready, able and willing to perform on his part, would breach the contract. The contract provided for partial performance at stipulated times until all the cattle had been delivered to appellant and by him accepted and paid for. Although the first delivery was not made on April 15th, as stipulated, but on May 5th, no point is made of that by either party.

The appellees, for the purpose, apparently, of showing that performance of the contract was entered upon by both parties, allege the delivery and the acceptance of 1,576 head of cattle on May 5th; thereafter, on May 9th, delivery and acceptance of 1,614 head; that these cattle were delivered, accepted and paid for under the terms of the contract of

March 10, 1914, except that as to the first delivery $3,000 were deducted from the total purchase price, on account of the bad condition and lessened value of the cattle in that shipment. The appellees plead this first delivery and the deduction of $3,000 from the contract price as a partial performance of the contract, treating it in the same light and with equal binding effect as the second delivery of 1,614 head. There is no suggestion in the pleadings, nor in the record anywhere, that the agreed deduction of $3,000 from the first shipment was a breach of the contract, and that the appellees did not so consider it is evidenced by the fact that they subsequently, on May 9th, made another delivery to the appellant. Both parties were proceeding under the contract up to the 13th of May as though the first two deliveries were entirely satisfactory and binding. Indeed, the appellees adopted that theory in drafting their complaint. In the absence of fraud, duress or mistake, it would seem that both the appellees and appellant were bound to accept as final the first and second shipments as performance *pro tanto* of the contract. The breach of the contract as pleaded by appellees was the refusal of the appellant to accept and pay for the 1,006 head tendered on the thirteenth day of May; that was the issue tendered by the appellees. The appellant admits that he refused to accept the 1,006 head, and assigns as a reason therefor that they were not of the grade and quality that he had contracted for; and pleads that the contract of March 10th had been so modified as that his obligation to accept said 1,006 head was contingent upon appellees delivering to him, under said contract, 2,000 head of the James cattle; that, although the appellees had at Nogales in the stockyards, on the thirteenth day of May, 1,000 head of the James cattle, they refused to deliver the same to appellant unless he would repay to them the $3,000 deducted from the delivery of May 5th.

It will be seen that an important question, so far as appellant was concerned, was as to whether the contract of March 10, 1914, was modified so as to include the James cattle in the delivery to be made to the appellant. If the contract was modified as contended by appellant, then clearly he was not guilty of breaching the contract on May 13th. This question was gone into at great length in the trial. Appellee Louis Giroux, who had active charge of the transaction for the ap-

pellees, admitted on the stand that on May 3d the question of putting in the contract the James cattle was discussed; that he and appellant went to the James ranch—a day's travel—to see the cattle; that he had promised to let appellant have them if things went satisfactory, that is, "if Mr. Kinney treated me right and everything was satisfactory in the country." He says, however, he did not agree to sell the James cattle to Kinney.

Against the testimony of Giroux was that of the appellant Kinney, who swears positively that the James contract was made; as did also Kinney's partner, John E. Edwards. Four other witnesses, Bowman, Patterson, Elias and Fowler, in no manner interested in the result of the suit, testified that Giroux had told them, or admitted in their presence, that he had sold the James cattle to the appellant Kinney. It is significant also that, on the thirteenth day of May, appellees actually had in the stockyards at Nogales, Arizona, 1,000 head of the James cattle with no arrangement whatever with the railroad company for cars in which to ship them, the appellant Kinney having procured from the transportation company the only cars there on hand and ready for use. The reason appellee Giroux assigned for refusing to let the appellant have the 1,000 head of James cattle then at Nogales carries with it a strong implication of the truthfulness of the contention of appellant that the James contract was actually made. He said in his cross-examination, in answer to a question:

"I told him if he would give me back the $3,000 that his man Edwards beat me—beat us—out of, I would let him have the James cattle.

"Q. And you refused to let him have the James cattle unless he did? A. Unless he gave me back the $3,000."

Notwithstanding the great preponderance of the evidence seems to sustain the contract concerning the James cattle, we would not feel disposed to disturb the verdict of the jury nor the ruling of the trial court in refusing a new trial if that were the only error complained of. Over the objections of appellant, the court permitted appellees to go into the contract of May 5th concerning the deduction of the $3,000 on the first delivery of cattle and also to introduce evidence that the cattle in that shipment were in good condition. Appellee Giroux was permitted to state that prior to the deduction he

did not consent to it.   Appellant Kinney was called as a witness for cross-examination by the appellees, and was compelled to answer over objection the following question and others of similar import:

"Is it not a fact, Mr. Kinney, that your knowledge that Giroux had deducted $3,000 from the purchase price of the first trainload influenced you to refuse to accept that third lot, in the hope that he would again reduce the purchase price?"

William P. Chester, a witness for appellees, was permitted to testify over objection that the cattle in the first shipment were in good condition.   In the argument of the objection to the introduction of testimony by appellees, concerning the first shipment and the deduction of $3,000, counsel for appellees stated the purpose of such testimony in the following language: "When Mr. Giroux shipped the 1,576 head, they held him up."

Although the first delivery was a closed chapter in this transaction, and although it had not been relied upon as showing or tending to show a breach upon the part of the appellant, and although the $3,000 deduction had been made agreeable to a mutual understanding and was not subject to any legal attack, still the court permitted the appellees to go into it for the purpose, as counsel for appellees stated, of showing that appellant had held the appellees up for the sum of $3,000. How this transaction may have been played before the jury by counsel for appellees in their argument may be easily imagined, and that it would tend to excite their prejudice is most certain.   We think the evidence should have been confined to the breach as alleged in the complaint, that is, the refusal by the appellant to accept and pay for the 1,006 head tendered on the thirteenth day of May, and the question as to whether the contract of March 10th was modified so as to include the James cattle; and that the court committed error in permitting the appellees to introduce evidence tending to impeach the honesty and binding effect of the settlement of the purchase price of the first delivery, as evidenced by the contract of May 5th.

The court should have given the instruction requested.   It is in the following language:

"You are instructed that the agreement of May 5th, between the plaintiffs and the defendant Kinney, by which a deduction of $3,000 was made on the price of the first shipment, is binding upon the plaintiffs; it appearing by the plaintiffs' own allegations that it was made under their authority, at a time when they knew all the facts, and that they waived any right to rescind it, or go behind it, by proceeding with the contract of March 10, 1914, and delivering more cattle. The plaintiffs are estopped to deny, and will not be permitted to deny, any facts recited in the contract of May 5, 1914."

The instruction accurately and properly stated the law. It would indeed be novel, as well as revolutionary, to permit a party to disprove his pleadings in order to prove a cause of action. It was for the court to construe the pleadings and their legal effect; and, inasmuch as the instruction asked defined the legal status of the appellees as established by their own pleading, it would seem that the instruction was imperatively demanded, in order to correct the error, if possible, committed by the court in permitting the introduction of testimony attacking the fairness and honesty of the settlement made upon the first delivery of cattle.

It is contended by appellant that, the appellees having asserted in their complaint ability to perform the unfinished part of the contract and the law imposing the requirement, it was incumbent upon them to prove it, but that the uncontradicted evidence showed that the appellees were not on the thirteenth day of May, nor in fact at any time after the tenth day of March, able to perform. The contract covered all the Alamo company cattle in the Moraga pasture, with the right of a fifteen per cent cutback after clearing the herd of all cripples, lump-jaws, swaybacks, dwarfs or runts, blind or unmerchantable cattle. The evidence shows that the Alamo Cattle Company, after March 10th and before the thirteenth day of May, sold and shipped from the Moraga pasture to California 1,150 three year old steers, over 1,200 two year old steers, and between 2,000 and 3,000 head of cows and heifers; that when the 1,006 head were gathered from the Moraga pasture nothing but remnants and cutbacks of the Alamo cattle remained, and that the 1,006 head were selected, at least in part, from what had been refused by other purchasers. One witness—the superintendent of the Alamo

Cattle Company—recognized and counted 228 head of the 1,006 as cutbacks of the Alamo cattle. This evidence seems to be uncontradicted; the contention on the part of the appellees being that the 1,006 head tendered appellant on the thirteenth day of May at Nogales averaged in grade, quality and condition with the first delivery from the Moraga pasture.

The contract called for the Alamo cattle as they were in the Moraga pasture on the date that the contract was made. The appellant was entitled to them; he could not be made to accept anything else. He could at his option take other cattle in lieu of the Alamo cattle and to that extent waive a strict compliance with the terms of the contract. But he was entitled to cattle of equal quality and grade to those he had contracted for; and whether he received such in fact in the first delivery taken from the Moraga pasture, and after, as the evidence shows, the best had been culled therefrom, we must assume that he did. The act of accepting and paying for them would estop him from questioning performance of the contract to that extent. The 1,006 head tendered him were largely of the Alamo cattle taken from the Moraga pasture, and were cutbacks from the sales made by the Alamo Cattle Company from the 10th of March up to and prior to the thirteenth day of May. As we read and interpret the contract, the appellant was entitled to "all the cattle owned by . . . the Alamo Cattle Company that are now in the Moraga pasture," with "the privilege of cutting out and rejecting fifteen per cent of said cattle after all cripples, lump-jaws, swaybacks, dwarfs or runts, blind or unmerchantable cattle have been cut out by the seller."

After the date of the contract, and before the 1,006 head were gathered from the Moraga pasture, there had been sold and taken therefrom over 4,000 picked cattle. The best fruit had been plucked and taken away; appellant was left only the culls to select from. The last delivery was not a tender of what he had bargained for. It was not enough that the cattle were of the same herd or brand that appellant bargained for, or that they were in good shipping condition, or that they averaged in grade and quality with the first delivery. The contract entitled the appellant to select his purchase from all the Alamo cattle in the Moraga pasture on March 10th, and not from what was left over after a

selection of 4,000 therefrom by other buyers. The cattle tendered him were not the cattle that he had contracted for, albeit they were from the Moraga pasture and of the same herd. He was not buying cattle, but specific cattle. He did not agree to take 8,000 head of anybody's cattle and pay therefor $25 per head. He bargained for cattle in a pasture of a certain ownership, and while the contract did not recite that there were 1,150 three year old and 1,200 two year old steers and between 2,000 and 3,000 cows and heifers, yet, if there were that many, he having bought all was entitled to all with the right to reject 15 per cent of those offered.

Appellant was not bound under the contract to take any other cattle than those of the grade and quality contracted for, and he was in a position to impose conditions upon his acceptance of any others. The condition he sought to impose when the 1,006 head were tendered him was that he would accept and pay therefor the stipulated price, if permitted to cut 50 head, providing also 1,000 head of the James cattle were delivered at the same time. It is suggested that appellant did not base his refusal to accept the 1,006 head upon the ground that, since he had bargained for the Alamo cattle, over 4,000 head had been sold and shipped to California, and that he ought not now to be allowed to base his refusal upon that ground. But he did base his refusal upon the inferior quality and grade of the cattle tendered him, and we think the bare statement that over 4,000 head had been selected by cattle buyers from the Alamo cattle in the Moraga pasture before the 1,006 head tendered him were gathered is enough to satisfy the most incredulous that the 1,006 head were not of the best grade or quality; and it is undisputed that 228 head of this tender were cutbacks from the Alamo cattle.

That the appellees were acting within the law in agreeing to sell and deliver the Alamo cattle to appellant, even though they did not at the time own them or have the authority from the owner to sell them, is well-settled law. We think it equally as well settled that no breach could be based on those facts until the time of delivery, and a refusal or inability is shown. But that is not this case. We have here a tender of a remnant of what was bargained for—a substitution of an inferior for a superior article—and even

though the buyer may not have known how or by what means the deterioration was brought about, and therefore failed to mention it as the reason for refusing to accept, it is certain the seller knew all, and under the rule of "fair play" should have explained and not have sought to practice an imposition.

It seems to us that the appellant, in refusing to accept the 1,006 head tendered him, was acting entirely within his rights, and that the appellees have signally failed to prove their case. The appellees having failed to perform their part of the contract in that they did not deliver or offer to deliver the cattle they had, by their contract, bound themselves to deliver at the time and place mentioned in the contract, were themselves guilty of breaching the contract.

Under the conceded and uncontroverted facts and the law, we think appellant was entitled to judgment. The judgment of the lower court is reversed, with directions that judgment be entered for appellant.

FRANKLIN and CUNNINGHAM, JJ., concur.